**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**MARY MIDGETT**                                                                                      **PLAINTIFF**

v.                                              **5:07CV00233-WRW**

**AETNA LIFE INSURANCE CO.,** *et al*.                                                **DEFENDANTS**

**ORDER**[1]

Pending is Plaintiff's Motion for Summary Judgment (Doc. No. 23). Defendants have responded (Doc. No. 41). Also Pending is Defendants' Motion for Summary Judgment as to Plaintiff's Claim for Short Term Disability (Doc. No. 27). Plaintiff has responded (Doc. No. 40). For the reasons set out below, Plaintiff's Motion (Doc. No. 23) is DENIED. Defendant's Motion (Doc. No. 40) is GRANTED.

**I. BACKGROUND**

A. The Short Term Disability Plan

Plaintiff was formerly employed by Washington Group as an assistant contract manager.[2] Plaintiff's major job responsibilities and duties included: (1) being at work when scheduled and maintaining a good attendance record; (2) dealing directly with customers to reach a negotiated settlement of Engineering Change Proposals, and establish procedures for providing an accurate status of approval and funding; (3) tracking approval and funding of Engineering Change Proposals, processing modifications, coordination of proposals plan, schedules and status; (4) developing a detailed understanding of the contract terms, conditions and applicable laws and regulations related to Department of Defense Contracts to ensure compliance with the provisions

---

[1] Much of this order is written in the vernacular of the medical community or ERISA -- I have not taken the time to translate it into plain English, or even common law legalese.

[2] Doc. No. 39.

of the contract and to avoid disputes whenever possible; (5) interpreting contract provisions to other project personnel to ensure compliance; (6) performing work assignments in the areas of contractual documentation and coordination with customer; (7) composing and preparing correspondence to the customer to explain routine and complex issues;        (8) coordinating and scheduling meetings and teleconferences with Site and Corporate Managers as required for proposal reviews; and (9) performing special assignments as directed by Contract Management.[3] While employed by Washington Group, Plaintiff participated in Washington Group's short-term disability ("STD") plan, an employee benefit plan governed by ERISA.[4] Plaintiff alleges that she is totally disabled, and entitled to STD benefits.[5] Under the STD plan, "'Total disability' or 'totally disabled' means you are unable to perform the material and substantial duties of your own occupation, you are not working at any job for wages or profit, and you are under the regular care of a physician."[6] The STD plan pays benefits "for disabilities that are approved by Broadspire."[7]

Under the Plan Document, the Board or CEO of Washington Group was to appoint an administrative committee ("Committee") to serve as the plan administrator.[8] The Committee

---

[3]MM 18. (All references to the administrative record are cited as MM.)

[4]Doc. No. 39.

[5]*Id*.

[6]MM 858.

[7]*Id*.

[8]MM 796, 798, 818.

could appoint or employ persons at its discretion in carrying out the Plan's provisions.[9] The Plan Document provided that the Committee and its agents were granted the exclusive right and discretion to interpret the terms and conditions of the Plan, including matters in connection with the Plan's administration.[10] The Plan Document also provided that all interpretations or decisions made were binding on all persons, subject to the claims procedures in each coverage document.[11]

Washington Group and Broadspire entered into a service agreement ("Service Agreement"), which designated Broadspire as the claims fiduciary for Washington Group's STD plan, with the responsibility for rendering all claims determinations in connection with the terms of the plan, eligibility determinations, and offsets.[12] Under the Service Agreement, Broadspire had "discretionary authority to render initial, first and second level appeal claim determinations, including interpreting the terms of the Plan, and otherwise making eligibility decisions consistent therewith."[13] Washington Group retained no responsibility for making final appeal determinations or for interpreting Plan provisions.[14]

Broadspire was the third-party claims administrator for the STD plan when Plaintiff filed

---

[9]MM 818.

[10]*Id*.

[11]*Id*.

[12]MM 942-80, 954.

[13]MM 954.

[14]MM 957.

her claim for STD benefits.[15] Aetna later bought Broadspire's long term disability and STD units, and, through the purchase, became the third-party claims administrator for the Washington Group's STD plan.[16]

      B. <u>Plaintiff's Relevant Medical History and the History of the Claim</u>

Plaintiff saw Dr. J.P. Jackson, an internist at the Little Rock Diagnostic Clinic, on October 2, 2002.[17] Dr. Jackson, noting that Plaintiff had mild osteoarthritis, concluded Plaintiff's medical problems were caused by full-blown fibromyalgia syndrome.[18] Dr. Jackson recommended physical therapy and a rheumatology consult as follow-up.[19]

At Dr. Jackson's request, Plaintiff had a rheumatologic consult with Dr. S. Michael Jones on October 4, 2002.[20] Dr. Jones diagnosed Plaintiff with left lateral hip discomfort, likely multifactoral, with an element of trochanteric bursitis; he noted that the internal range of motion was not completely normal and suggested there may have been degenerative change.[21] Dr. Jones found that Plaintiff had generalized muscoskeletal discomfort with chronically poor sleep, indicating an underlying myofascial-type chronic pain syndrome.[22]

---

[15] MM 329, 529, 553.

[16] MM 571.

[17] MM 647-49.

[18] MM 648-49.

[19] MM 648-649.

[20] MM 650.

[21] MM 652.

[22] *Id*.

On August 9, 2005, Plaintiff saw Dr. Michael M. Moore. In Dr. Moore's opinion, Plaintiff's right hand pain symptoms were related to degenerative arthritis and possibly carpal tunnel syndrome.[23] Dr. Moore recommended that Plaintiff undergo nerve conduction, EMG studies, and a triphasic bone scan, and return to his office to decide on a final treatment plan.[24] At a follow-up appointment on March 27, 2006, Dr. Moore fit Plaintiff for a hand splint and gave her an injection in her right long finger MP joint.[25] Plaintiff was instructed to buddy tape the index, long, and ring fingers when using her right hand.[26] Athroplasty would be performed on April 17, 2006, if Plaintiff's symptoms did not improve with the other, more conservative treatment.[27]

Dr. Ruben Tejada examined Plaintiff on November 30, 2005, at which point Plaintiff related concerns about suffering episodes of dementia at work and home.[28] Dr. Tejada noted Plaintiff's fibromyalgia was a factor, and thought her medications might play a role with her forgetfulness.[29] Dr. Tejada prescribed Plaintiff Provigil to see if it would make her more alert,

---

[23] MM 656.

[24] *Id.*

[25] MM 670.

[26] MM 670.

[27] MM 670.

[28] MM 658. Dr. Tejada identified Plaintiff's appointment as a follow-up visit. Because the documentation of the original visit is not in the record, the findings from any initial visit are unknown.

[29] *Id.*

and noted she had no other neurological problems at that time.[30] On December 27, 2005, Dr. Tejada wrote a letter to Washington Group on Plaintiff's behalf, stating Plaintiff suffered from several maladies, including necrosis and fibromyalgia.[31] Dr. Tejada thought that Plaintiff's fibromyalgia would continue, even with the medication she was on, and that Plaintiff's forgetfulness was likely due to either a side-effect of the medication, or Plaintiff's lack of restful sleep.[32]

On March 7, 2006, Dr. Reginald Rutherford administered an EMG, motor nerve conduction study, sensory nerve conduction study, and a needle examination to assess the problems Plaintiff was having with her right hand; Dr. Rutherford found that the results of all the tests were normal.[33]

Plaintiff saw her primary care physician, Dr. John E. Harris, twice in early March, 2006 -- the first visit was in connection with pain management issues, and during the second visit, Plaintiff told Dr. Harris that she wanted to go on disability.[34] Dr. Harris performed a sedimentation rate test on Plaintiff on March 13, 2006; the results were normal.[35] Dr. Harris noted that Plaintiff suffered from fibromyalgia.[36]

---

[30] *Id.*

[31] MM 659.

[32] *Id.*

[33] MM 667-68.

[34] MM 302, 673.

[35] MM 303, 674.

[36] MM 302, 603.

Plaintiff filed her claim for STD benefits on March 13, 2006, stating that her last day at work was March 3, 2006, and that her first day of disability was March 6, 2006.[37] Plaintiff reported fibromyalgia as the cause of her disability, and also stated that she suffered from arthritis and avascular necrosis.[38] According to the record, on March 14, 2006, Plaintiff's Claims Examiner informed her that her medical information would be sent to a physician for peer review, and that she would be contacted later.[39]

Plaintiff was examined by Dr. Michael Courtney, a chiropracticer, on March 20, 2006.[40] Dr. Courtney's notes read: "Based on the available clinical data, exam, patient history, and x-ray findings to date, my initial diagnostic impression is that this lady suffers from cervical segmental dysfunction, Grade 1 spondylolisthesis L5, degenerative disk disease lumbar spine, bilateral sciatic neuritis, fibromyalgia, and muscle spasms."[41] Dr. Courtney noted that lumbar segmental dysfunction also includes the sacrum, and that Plaintiff has a pelvic distortion.[42] Dr. Courtney concluded: "This lady is disabled, in my professional opinion."[43]

On March 22, 2006, Plaintiff contacted her Claims Examiner.[44] Based on the Examiner's notes in the record, Plaintiff told the Examiner that her doctor would not give her a referral to a

---

[37]MM 3, 9, 329.

[38]MM 6, 331-32.

[39]MM 11-12.

[40]MM 676.

[41]MM 680.

[42]*Id.*

[43]*Id.*

[44]MM 33.

chiropractor; instead, her doctor referred her to a psychiatrist.[45] Plaintiff stated she felt her doctor accused her of malingering, and that she wanted to change doctors.[46] The Examiner told Plaintiff that she could change doctors if she wanted to, but she would have to provide updated medical information for any new doctors she sees.[47] The Examiner also told Plaintiff that if the peer review came back with insufficient medical information, Plaintiff could file an appeal.[48]

Dr. Tracy T. Phillips replaced Dr. Harris as Plaintiff's primary care physician.[49] Dr. Phillips saw Plaintiff on March 27, 2006, and referred Plaintiff for an MRI.[50] In the assessment section of Dr. Phillip's report, she noted fibromyalgia and avascular necrosis hip.[51] At a follow-up appointment on April 10, 2006, Dr. Phillips noted fibromyalgia in her assessment.[52]

On March 27, 2006, Dr. Yvonne Sherrer completed a peer review of Plaintiff's case.[53] Dr. Sherrer reviewed medical information received from Dr. Harris, including office notes dated March 8 and March 13, 2006, a lab report dated March 13, 2006, and Plaintiff's job description.[54] Dr. Sherrer also spoke with Dr. Harris on March 20, 2006.[55] Dr. Harris told Dr.

---

[45]*Id.*

[46]*Id.*

[47]*Id.*

[48]*Id.*

[49]MM 709.

[50]*Id.*

[51]*Id.*

[52]MM 720.

[53]MM 611.

[54]MM 609.

[55]MM 610.

Scherrer that there was a letter, dated December 2005, from Plaintiff's initial treating physician, which requested disability for "a lot of personal problems" and trouble sleeping.[56] Dr. Harris told Dr. Sherrer that he had been treating Plaintiff for only about three weeks, and did not feel comfortable making a determination regarding disability at this time; Dr. Harris recommended a Functional Capacity Evaluation.[57] Dr. Sherrer found that the record did not support a functional impairment that would prevent Plaintiff from performing sedentary work.[58] She concluded that a comprehensive rheumatological evaluation stressing functionality and a psychological evaluation might be helpful for further review.[59]

Dr. Tamer Alsebai conducted a new patient consultation with Plaintiff on April 4, 2006.[60] Dr. Alsebai reviewed the records of Drs. Harris, Tejada, Jones, and Courtney.[61] After he examined Plaintiff, Dr. Alsebai noted as his impression: fibormyalgia; osteoarthritis of both hands and involving the MCP joints; paresthesias in both upper and lower extremities; depression; and osteopenia.[62] He noted: "I am not sure if the patient will be able to go back to work given her multiple conditions and given the medications which she is going to require which probably will interfere with her job . . . . She clearly understands that."[63] Dr. Alsebai had

---

[56]*Id.*

[57]*Id.*

[58]*Id.*

[59]*Id.*

[60]MM 714.

[61]*Id.*

[62]MM 716.

[63]MM 717.

another sedimentation rate test performed on Plaintiff, the results of which were high as compared to the results of the same test on March 13, 2006.[64]

On April 4, 2006, Plaintiff had an MRI of the lumbar and cervical spine.[65] On April 10, Plaintiff underwent a bone density test.[66]

Dr. Sherrer conducted a second peer-to-peer conference and review, considering additional medical records from Drs. Harris and Courtney, as well as an additional job description.[67] Dr. Sherrer found that "[t]here is an extensive chiropractic report that documents x-rays showing degenerative changes, but does not document functional abnormalities that would be expected to prevent this claimant from doing sedentary or light work."[68]

Plaintiff's Claims Examiner informed her in a telephone conversation on April 12, 2006, that there was insufficient medical information to support ongoing disability.[69] A letter to Plaintiff, dated April 13, 2006, confirmed the decision and informed Plaintiff of her right to appeal the decision.[70]

After Plaintiff's claim was denied, she was examined by a host of other doctors. In April, 2006, she saw Dr. Silas, whose impression was lumbar disc disease, right; cervical degenerative

---

[64]MM 718.

[65]MM 710-13.

[66]MM 243-48.

[67]MM 612-13.

[68]MM 613.

[69]MM 50.

[70]MM 315-16.

disc disease; essential tremor; and fibromyalgia.[71] On a follow-up visit in May, 2006, Dr. Silas noted Plaintiff's range of motion had improved, and that she was experiencing less pain.[72]

Dr. Harold Chakales examined Plaintiff on May 3, 2006, and diagnosed her with cervical degenerative disk disease with nerve compression; Grade 1 spondylolisthesis with instability, L5-S1; fibromyalgia/fibromyositis, rule out nerve compression, lumbar spine and osteoporosis by radiographic appearance.[73] Dr. Chakales recommended Plaintiff undergo further testing.[74]

Plaintiff saw a licensed clinical social worker, Lisa Hoover, in April, 2006, and on other later dates. Ms. Hoover noted that she expected Plaintiff would be able to deal with her problems, but also noted that a major depressive disorder should be ruled out.[75]

On May 9, 2006, Plaintiff filed her appeal of the denial of her STD benefits claim, and submitted records from Dr. Alsebai, Dr. Silas, Lisa Hoover, and others.[76] Plaintiff then underwent further medical testing, and was seen by additional physicians.

A nerve conduction study on May 24, 2006, indicated that the nerve conduction velocity test of the left leg was normal, and mild chronic bilateral S1 radiculopathies, right worse than left, was probable.[77] A bone scan administered on May 24, 2006, indicated intense uptake in the lower cervical spine -- likely degenerative, intense uptake in the left femoral diaphysis in

---

[71]MM 728.

[72]MM 738.

[73]MM 734.

[74]*Id.*

[75]MM 732.

[76]MM 66-68.

[77]MM 745.

connection with Plaintiff's prosthesis, and other abnormal activity in Plaintiff's knees, hands, wrists, shoulders -- likely degenerative.[78]

In late May, 2006, Dr. Chakales saw Plaintiff on two occasions. In connection with one visit, Dr. Chakales noted that Plaintiff had symptomatic spondylolisthesis with chronic nerve root irritation and fibromyalgia.[79] He also noted that Plaintiff had been temporarily totally disabled since March 3, 2006, because of those conditions, and that Plaintiff may not be able to return to work.[80]

Dr. Bruce Safman examined Plaintiff on June 6 and June 21, 2006; on both occasions, he noted fibromyalgia and avascular necrosis.[81] On July 19, 2006, Plaintiff complained of severe pain, and Dr. Safman gave Plaintiff trigger point injections.[82] Notes from an August 21, 2006, appointment with Dr. Safman indicate that Plaintiff's pain was under fairly good control.[83]

Dr. Wendy Weinstein performed a peer review on July 12, 2006, and reviewed letters and files from the doctors noted above, as well as the results of multiple medical tests and Plaintiff's job description.[84] Dr. Weinstein acknowledged Plaintiff's fibromyalgia diagnosis, but found no functional impairment that precluded Plaintiff from performing her sedentary job.[85] Another peer

---

[78] MM 747-48.

[79] MM 746.

[80] *Id.*

[81] MM 751, 754.

[82] MM 757.

[83] MM 202.

[84] MM 622-26.

[85] MM 624-625.

12

review was performed by Dr. Vaughn Cohan, a neurologist, who also concluded that, while Plaintiff was diagnosed with fibromyalgia, there was no evidence that Plaintiff could not perform her sedentary job.[86] Dr. Lawrence Burstein, a psychologist, also performed a peer review, finding that the medical record did not support a conclusion that any impairments in Plaintiff's psychological functioning precluded her from performing her job.[87] Dr. Jacques Caldwell, whose specialty is rheumatology, noted that Plaintiff had "at least 14 out of 18 tender points with a good range of motion of her lumbar spine."[88] Dr. Caldwell concluded in his peer review that neither a rheumatologic condition, nor the medications Plaintiff was taking, would have prevented Plaintiff from performing her job.[89]

On August 21, 2006, Plaintiff's appeal was denied;[90] she filed her final level appeal on October 24, 2006.[91]

On January 19, 2007, Drs. Lisa Rice and Greg Wooten, both of Southeast Arkansas Behavioral Healthcare System, where Plaintiff was a patient, confirmed Plaintiff had been diagnosed with Depressive Disorder NOS.[92] While the clinic's policy is not to specify if a person is disabled, the doctors wrote that Plaintiff might not be able to return to work because of her

---

[86]MM 617.

[87]MM 618-621.

[88]MM 629.

[89]*Id.*

[90]MM 101.

[91]MM 105.

[92]MM 138.

depression.[93] The doctors recommended a neuropsychological exam to determine Plaintiff's exact cognitive impairment.[94]

Dr. Barry McDonald performed a neuropsychological evaluation[95] on Plaintiff, and, apparently, the results were in the normal range, although some tests suggested Plaintiff had performed better in the past in some areas.[96]

During Dr. Chakales's deposition, he stated that Plaintiff is suffering from "symptomatic first degree spondylolisthesis, L5-S1, with chronic never root compression, primarily on the left side. Number two, symptomatic cervical spondylosis."[97] In Dr. Chakales's opinion, Plaintiff is permanently and totally disabled.[98]

Two more peer reviews were performed, by Drs. Lawrence Blumberg (an orthopedic specialist) and Elana Mendelssohn (a neuropsychologist); neither doctor found Plaintiff to be suffering from a condition that would prevent her from performing her job.[99] In June, 2007, Dr. Jakob Ulfarrson performed the last peer review, and concluded that the medical record "does not support functional impairment for [Plaintiff's] own occupation at a sedentary physical demand

---

[93] MM 139.

[94] MM 138.

[95] The evaluation consisted of multiple tests administered in February - April, 2007.

[96] MM 150-57.

[97] MM 165.

[98] MM 180.

[99] MM 591-95, 596-601.

rating."[100]

On July 18, 2007, the Aetna Appeal Committee, having considered Plaintiff's full medical record, voted to uphold the denial of Plaintiff's STD claim.[101] Plaintiff's counsel was informed of this decision by letter dated July 18, 2007.[102] Plaintiff then filed this cause of action.

## II. DISCUSSION

### A. Standard of Review

Under ERISA, "[a] civil action may be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of the plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits . . . ."[103] A denial of benefits under a plan governed by ERISA is to be reviewed *de novo*, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[104] When an ERISA plan grants discretion, courts review a plan administrator's decision under an abuse of discretion standard.[105] A plan administrator's decision will be reversed under an abuse of discretion standard "'only if it is arbitrary and capricious.'"[106] When a claimant shows that a "serious procedural irregularity caused a serious breach of the

---

[100] MM 606.

[101] MM 129-35.

[102] MM 533-36.

[103] 29 U.S.C. § 1132(a)(1)(B).

[104] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[105] *Jessup v. Alcoa*, 481 F.3d 1004, 1006 (8th Cir. 2007).

[106] *Groves v. Metro. Life Ins. Co.*, 438 F.3d 872, 874 (8th Cir. 2007) (quoting *Herbert v. SBC Pension Benefit Plan*, 354 F.3d 796, 799 (8th Cir. 2004)).

administrator's fiduciary duty," courts use "a sliding scale approach somewhere between abuse of discretion and *de novo*."[107]

The Washington Group International, Inc. Health and Welfare Benefits Plan Document ("Plan Document") sets out, in Article 8.01(b):

> The Committee and its designated agents shall have the exclusive right and discretion to interpret the terms and conditions of the Plan and to decide all matters arising with respect to the Plan's administration and operation (including factual issues). Any interpretations or decisions so made shall be conclusive and binding on all person, subject to the claims procedures set forth in each respective coverage document.[108]

The Plan Document addresses Claims and Claims Procedure and Appeal of Benefit Denials in Articles 5.06 and 5.07.[109] In Article 5.06, Claims, the Plan Document provides: "Except as otherwise provided in the [Summary Plan Description ("SPD")] . . ." and then gives information about claims.[110] In Article 5.07, Claims Procedure and Appeal of Benefit Denials, the Plan Document incorporates by reference the processes set out in the SPD for making a claim for benefits and for appealing a claim for benefits.[111]

The SPD for STD benefits is located in Appendix E of the Plan Document. Under the table of contents, the SPD states: "This material describes only certain portions of some of the Company's benefit plans. It does not supersede the actual provisions of the applicable plan

---

[107]*Hamilton v. Standard Ins. Co.*, 516 F.3d 1069, 1073 (8th Cir. 2008).

[108]MM 818.

[109]MM 812.

[110]*Id.*

[111]*Id.*

documents, which in all cases are the final authority . . . . Only the Plan Administrator can interpret the terms of the plans."[112]

The Service Agreement for STD benefits identifies Broadspire as the plan administrator.[113] The Service Agreement also designates "Broadspire as the claims fiduciary for Client's STD Plan and frozen sick leave policy . . . ."[114] The Service Agreement reads: "Client hereby delegates to Broadspire discretionary authority to render initial, first and second level appeal claim determinations, including interpreting the terms of the Plan, and otherwise making eligibility decisions consistent therewith."[115] Aetna later bought Broadspire, and assumed its responsibilities.

Plaintiff asserts the Court should review this case *de novo* because: (1) the SPD for the STD benefits does not contain discretion granting language, and (2) documentation produced by Defendant, and used by Defendant to show that it granted discretion to Broadspire, was not part of the administrative record and not disclosed in a timely fashion.[116]  Plaintiff objects to the Court considering those documents.[117] However, these documents are attached to her Motion for Summary Judgment as part of the administrative record. A court may consider a Plan Document that is not in the administrative record to determine the standard of review, as long as the court

---

[112]MM 856.

[113]MM 950.

[114]MM 954.

[115]*Id*.

[116]Doc. No. 24.

[117]*Id.*

does not consider evidence outside of the administrative record for the purpose of determining benefits.[118] Accordingly, the Court will consider the Plan Document in determining the appropriate standard of review.

The Plan Document gives the administrator the authority to determine eligibility for benefits or to interpret the terms of the Plan. In Article 5.07, the Plan Document incorporates by reference the procedures set out in the SPD. The SPD provides that only the Plan Administrator can interpret the terms of the plan; the SPD is otherwise silent as to discretion. Broadspire, later replaced by Aetna, is the plan administrator. In the Service Agreement, Broadspire is granted discretion "to render initial, first and second level appeal claim determinations, including interpreting the terms of the Plan, and otherwise making eligibility decisions consistent therewith." Nothing in the SPD is inconsistent with that grant of authority.[119] "Although the provisions of an SPD prevail over conflicting provisions contained in the actual plan, the rule does not apply 'when the plan document is specific and the SPD is silent on a particular matter. While clear and unambiguous statements in the summary plan description are binding, the same is not true of silence.'"[120] Because the Plan Document grants discretion, and the SPD is silent, the abuse of discretion standard applies here.

B. <u>Was the Plan Administrator's Decision Arbitrary and Capricious</u>?

As set out above, a plan administrator's decision will be reversed under an abuse of

---

[118]*Farley v. Ark. Blue Cross & Blue Shield*, 147 F.3d 774, 776 n.4 (8th Cir. 1998).

[119]MM 954.

[120]*Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1198 (8th Cir. 2002) (quoting *Jensen v. SIPCO, Inc.*, 38 F.3d 945, 952 (8th Cir. 1994)).

discretion standard "'only if it is arbitrary and capricious.'"[121] According to Webster's Dictionary, arbitrary means based on impulse or whim;[122] capricious means characterized by or subject to whim.[123] A plan administrator's decision "need be only reasonable, meaning that it must be supported by substantial evidence."[124] A plan administrator's decision need not give more weight to a treating physician's opinion.[125] Peer review of a treating physician's records is an accepted method of review.[126] If a plan administrator's decision is based on relevant evidence that a reasonable person could find supports the conclusion, the decision should be upheld.[127]

Plaintiff was examined by more than a dozen doctors, and eight physicians performed peer reviews. In connection with the doctors that examined patient: at least one was uncomfortable concluding Plaintiff was disabled; several found that she was disabled; and the notes and results of exams with others simply presented findings with no opinion as to whether or not Plaintiff is disabled. The question here, however, is not whether Plaintiff was disabled, but if Plaintiff was disabled as defined in the STD plan. The SPD for STD benefits provides, in part, that "'total disability' or 'totally disabled' means you are unable to perform the material and substantial duties of your own occupation . . . ."[128]

---

[121] *Groves*, 438 F.3d at 874.

[122] WEBSTERS NEW RIVERSIDE DICTIONARY 37 (Revised Edition 1996).

[123] WEBSTERS NEW RIVERSIDE DICTIONARY 106 (Revised Edition 1996).

[124] *Alexander v. Trane Co.*, 453 F.3d 1027, 1031 (8th Cir. 2006).

[125] See *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003).

[126] See *Dillard's Inc. v. Liberty Life Assur. Co.*, 456 F.3d 894 (8th Cir. 2006); *Weidner v. Fed. Express Corp.*, 492 F.3d 925 (8th Cir. 2007).

[127] See *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994 (8th Cir. 2005).

[128] MM 529.

None of the peer review doctors found that Plaintiff was impaired to the point of being unable to perform the material and substantial duties of her occupation. As set out above, several treating physicians found Plaintiff disabled. Of those doctors, Dr. Courtney noted only that Plaintiff was disabled, not that she would be unable to work. Drs. Alsebai, Rice, and Wooten were uncertain if Plaintiff would be able to return to work. Dr. Chakales found that Plaintiff would not be able to work. Then, as set out above, numerous doctors examined Plaintiff, but were silent as to whether she was disabled -- at least as defined by the STD plan.

The arbitrary and capricious standard is high, especially considering that plan administrators are under no obligation to give greater weight to the opinions of treating physicians versus the findings peer review physicians. Considering the following, the plan administrator's denial of Plaintiff's STD claim was not arbitrary or capricious: (1) Dr. Harris, Plaintiff's primary care physician, was uncomfortable classifying Plaintiff as disabled; (2) numerous treating physicians' notes were silent as to disability; (3) none of the peer review physicians found Plaintiff disabled; and (4) plan administrators need not accord greater weight to treating physicians than peer review physicians.

## III. CONCLUSION

Because the plan administrator's decision was not arbitrary and capricious, its decision should be upheld. Accordingly, Plaintiff Motion for Summary Judgment (Doc. No. 23) is DENIED, and Defendants' Motion for Summary Judgment (Doc. No. 27) is GRANTED.

IT IS SO ORDERED this 1st day of July, 2008.

                                        /s/Wm. R. Wilson, Jr.
                                    UNITED STATES DISTRICT JUDGE